**SO ORDERED.**

**SIGNED this 24th day of January, 2014.**





Robert E. Nugent
United States Chief Bankruptcy Judge

DESIGNATED FOR ONLINE PUBLICATION BUT NOT PRINT PUBLICATION

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF KANSAS

IN RE:                                  )
                                        )
PAUL A. GARCIA,                         )    Case No. 12-10393
                                        )    Chapter 13
                                        )
            Debtor.                     )
_____)

## ORDER ON FIRST MOTION FOR ADMINISTRATIVE EXPENSES OF MARK J. LAZZO

Mark J. Lazzo, counsel to debtor Paul Garcia, filed his First Motion for Administrative Expenses on December 6, 2013.[1] Both creditor Lenore Garcia Trust and the chapter 13 Trustee objected. The Trust's objections center on whether Mr. Lazzo's work was in furtherance of the debtor Garcia's allegedly improper efforts to misappropriate the Lenore's La Casita restaurant from the Trust. The Trust also says

---

[1] Dkt. 155.

1

that Mr. Lazzo should be denied compensation in its entirety because he failed to timely file a Fed. R. Bank. P. 2016(b) disclosure of the funds he received from Paul Garcia as payments toward his fees. The Trustee complains about the reasonableness and necessity of several time entries. After hearing evidence in this matter on January 15, 2014, reviewing the memoranda filed in the matter, and independently reviewing Lazzo's attorneys fee statements, I conclude that the Trustee's and Trust's objections to the allowance of the requested fees under §330(a) should be OVERRULED, but that the fees must be reduced as a sanction for counsel's failure to timely file his Rule 2016(b) disclosure.

***Facts Concerning Retainer and Underlying Controversy***

a. <u>Background</u>

Paul Garcia and his brother Alex each filed chapter 13 cases in late February 2012.[2] Attorney Sarah Newell filed both cases. Paul and Alex operated Lenore's La Casita, a restaurant in Salina, having acquired the restaurant from their mother's Trust after her death. This had been their mother's restaurant and it was the source of family discord even before these cases were filed. Paul and Alex were each members of Lenore's La Casita LLC, each claiming a one-half equity interest in the venture. The LLC was in good standing, but no one offered in evidence its operating agreement. Nor is there any evidence that the members ever appointed a manager. Both Alex and Paul testified that they each received bi-weekly draws of about $1,000. They would share any remaining profits from the restaurant from time to time. The

---

[2] *In re Alex Garcia,* Case No. 12-10394 (Bankr. D. Kan.)

2

LLC paid the legal fees they incurred in defending against prepetition state court litigation relating to their administration of Lenore's Trust that was brought against them by their brothers. Alex maintained the LLC checkbook and was responsible for paying the operating expenses of the company, at least until Paul allegedly excluded him from the premises and took over operating the restaurant at some point during 2013.

> b. <u>Lazzo's Entry of Appearance and Fee Agreement</u>

Sometime after these cases were filed, the brothers fell out. Each asserts that the other disrupted the business. Each filed a protection from stalking case against the other in Saline County District Court. With this conflict between the brothers came a conflict for Ms. Newell, too. She could no longer represent either of them. In January of 2013, she approached Mark Lazzo to represent Paul. After telephone and office conferences with Paul, on January 24, 2013, Lazzo executed a fee agreement with him that provided for Garcia to pay a $2,000 retainer against Lazzo's attorney fees which would be billed at $200 per hour.[3] No one has objected to the reasonableness of this hourly rate. Lazzo entered his appearance and Newell her notice of withdrawal on February 18, 2013.[4] Garcia paid Lazzo the $2,000 retainer by a check dated January 23 and drawn on his personal account as the fee agreement provides.[5] Though that agreement only called for a $2,000 retainer, Paul Garcia paid much more, sending Lazzo another $2,000 on February 15, 2013 for "lawyers fee."[6]

---

[3] Trustee Ex. S.
[4] Dkt. 82.
[5] Trustee Ex. A. The memo line of the check notes that it is a retainer.
[6] Trustee Ex. B.

3

Then, in late March, Garcia sent Lazzo a check drawn on the Lenore's La Casita account for another $2,000, but that check was returned purportedly after Alex stopped payment on it.[7] On April 7 and 22, Paul paid Lazzo another $2,500 and $500 by checks drawn on his personal account.[8] On May 4, Paul paid $500 to Lazzo for attorneys fees from the Lenore's La Casita account; that check cleared.[9] Paul made two additional $500 payments to Lazzo from his personal account on May 12 and 22.[10] Finally, he paid Lazzo two checks in October and November for $1,000 each written on La Casita Salina which is the trade name of Paul Garcia, L.L.C., the company that houses Paul's restaurant.[11] In all, Lazzo collected $10,500, all of which he deposited in his law practice trust account, but did not file his Rule 2016(b) disclosure until the Trustee moved to dismiss this case in November of 2013.[12] He has not applied any of this money to his fee.

    c. <u>Services Rendered and Disputed Entries</u>

By the time Lazzo entered the case, the trustees of the Trust had filed an adversary proceeding to except a variety of debts from both Alex and Paul Garcias'

---

[7] Trustee Ex. C. The record of the check indicates it was returned for insufficient funds.
[8] Trustee Ex. D and E.
[9] Trustee's Ex. C. Both of the Lenore's La Casita checks were signed by Paul Garcia; he was an authorized signatory on the account. According to Paul, the $500 Lenore's check represented his share of the profits from the restaurant.
[10] Trustee Ex. F.
[11] Trustee Ex. G and H.
[12] By the Court's calculation, these checks total $10,500, not $11,000. But the parties have proceeded on the premise that the amount received by Lazzo is $11,000 – apparently due to Lazzo's Rule 2016(b) disclosure indicating that he has received payments totaling $11,000. Lazzo's Trust Account deposit summary also totals $11,000. *See* Trustee's Ex. V. This discrepancy in the amount of fees paid by Garcia has not been explained.

4

discharge.[13] The trust generally alleged that Alex and Paul Garcia breached their fiduciary duties as trustees of their mother Lenore Garcia's living trust by failing to honor its testamentary provisions and by failing to account for its income and assets to the other Garcia heirs. In addition to this problem, Lazzo also discovered that some of the Trustee's requests for information about the La Casita restaurant had not been answered. Knowingly or not, Lazzo had stepped into a maelstrom of internecine family disputes that involved not only state and bankruptcy court litigation, but also bad blood among the Garcia brothers over the alleged dissipation of their mother's estate. Any lawyer entering this case at this stage could anticipate that getting up to speed would be time-consuming and expensive.

The Trustee questions five (5) of Lazzo's time entries: March 28, April 2 and 3, and July 17 and 18, as to their reasonableness and necessity.[14] No claim is made that the hourly rate proposed by Lazzo is unreasonable. Lazzo's time entries were made contemporaneous with his performance of the work.

On March 28, he charged 1.1 hours to confer with Paul Garcia regarding the Trustee's subpoena of information from La Casita and for time spent e-mailing with accountant Jessica Loveland regarding responding to same. On April 2, he billed 1 hour for a conference with his client concerning the Trustee's motion to compel a response to her request for financial information and taking a call from Alex Garcia.

---

[13] Adv. Proc. No. 12-5126 filed August 2, 2012. This proceeding is set for trial on January 28, 2014. It is being pursued by Paul's brothers, William Garcia and Victor Garcia, the successor trustees to the Lenore Garcia Revocable Inter Vivos Trust.
[14] *See* Dkt. 155-1 (Debtor Ex. 1) for Lazzo's billing statement.

5

On April 3, he billed .2 hours for a conversation with the Trustee regarding her inquiries.

Lazzo says he did this work in response to the Trustee's subpoena and written request for information about the restaurant. On December 21, 2012, the Trustee served a subpoena on the LLC by sending it to Sarah Newell, then Alex and Paul's lawyer. On January 14, 2013, the Trustee filed a motion to compel compliance with the subpoena and I entered an order granting that motion on February 7. Then, on February 18, Newell withdrew as counsel and Lazzo entered his appearance for Paul. On March 19, the Trustee filed a motion to dismiss, based in part on Paul's failure to respond to requests for information. Lazzo's work on March 28 and April 1, 2, and 3 appears to have been prompted by this motion. It is clear that the subpoena had not been adequately answered by the time he entered the case. In fact, the Trustee's letter of May 23, 2013 acknowledges receipt of what Lazzo sent her on March 30 and poses follow up questions.[15]

The Trustee also questions whether Lazzo should be paid for work done on July 17 and 18 that related to preparation of a motion to allow Garcia to lease the Lenore's location and to purchase the Lenore's restaurant equipment from its secured creditor, the Bank of Tescott, after negotiations with these third parties. Lenore's had defaulted on the rent and was facing eviction. It had also defaulted on its bank debt and the Bank of Tescott was preparing to foreclose. This work amounts to 2.8 hours of time. The motion was never filed because, according to Lazzo, the landlord backed

---

[15] Trustee Ex. DD.

6

Case 12-10393   Doc# 204   Filed 01/24/14   Page 6 of 19

out of the arrangement and made additional demands for curing Lenore's back rent. The Trustee questions the necessity and reasonableness of the time spent and whether Lazzo should be paid for work on pleadings that weren't ultimately filed and deals that were not consummated.

The Trust claims that Lazzo should receive no compensation because he failed to file a timely Fed. R. Bankr. P. 2016(b) disclosure and because his work contributed to what it claims is Paul Garcia's misappropriation of the Lenore's business. Lazzo testified that when he entered the case, he concluded that the restaurant was Paul Garcia's only means of funding his chapter 13 plan and that, after the disputes with the landlord and the lender cropped up, preservation of the restaurant operation by securing a new lease and acquiring the equipment was Paul's most viable means of servicing his debt. The Trust also asserts in its brief that Lazzo actively concealed his receipt of these funds when he responded to the Trustee's May 23 query about unpaid rents by stating that Alex had not paid the rent.

    d. <u>The Disclosure Issue</u>

The Trustee did not raise Lazzo's failure to file a timely Rule 2016(b) disclosure as a basis for objecting to his fees. Instead, she filed a separate motion to disgorge the retainer pending this Court's further allowance of Lazzo's applications.[16] Lazzo acquiesced in that motion and has agreed to turn over the retainer to the Trustee pending this Court's further order.

---

[16] *See* Dkt. 146.

Lazzo admits that he should have filed a formal disclosure of his retainer and fees received from Garcia before November 21, 2013.[17] He did not provide a cogent reason why he failed to do so, other than his testimony that he verbally disclosed his receipt of payments to the Trustee. He testified that he told Karin Amyx (formerly Tollefson), the Trustee's attorney, about having received the retainers in a telephone conversation sometime in June or July of 2013 in response to her conversational question about how he would be getting paid for his work in a messy case. Amyx testified that Lazzo didn't tell her he'd received a retainer; instead she said that when she asked him how he expected to be paid, he replied that he'd file a fee application. Ms. Amyx had no written record of this conversation and Lazzo's time records contain no specific reference to these discussions, although they do refer to a number of conversations between him and the Trustee or her counsel, including one with Amyx on June 20 "regarding cure of payment default under plan."[18] As this conversation only took 12 minutes (.2 hours), it is possible that Lazzo didn't mention the retainer or that he did and Amyx forgot about it. On this record, I cannot conclude that it is more likely than not that Lazzo specifically told Amyx about the retainer payments. Other references in Lazzo's billings identify contact or communication with the Trustee early on, but none is specific to the matter of his attorney fees or payment thereof.

The Rule 2016 disclosure, like the fee agreement, discloses that Lazzo will be paid an hourly rate of $200. Unlike the fee agreement, the disclosure, reveals that

---

[17] Dkt. 145; Trustee Ex. U.
[18] Dkt. 155-1, p. 7.

8

the debtor or La Casita Salina, Paul Garcia's LLC, had paid a total of $11,000 between January-November 2013 toward prospective fees as approved by the court after application and order.[19] The disclosure makes no reference to Lenore's La Casita LLC being the source of at least one fee payment.[20]

On September 1, 2013 Lazzo generated an invoice to Garcia, itemizing his time and services for attorney fees for the period January 17, 2013 to August 14, 2013 in the amount of $10,260.[21] He attached the invoice to his First Application for Fees and Expenses filed December 6, 2013.[22]

*Analysis*

1. <u>Lazzo's Fees Are Allowable Under §§330(a) and 503(b)</u>.

Chapter 13 debtors' attorneys may receive reasonable compensation for services they perform—

> . . . for representing the interests of the debtor in connection with the bankruptcy case based on a consideration of the benefit and necessity of such services to the debtor and the other factors set forth in this section.[23]

Attorneys for debtors in the other remedial chapters cannot recover compensation for services that are not reasonably likely to benefit the estate or are necessary to its administration.[24] Chapter 12 and 13 debtors' lawyers are not

---

[19] Trustee Ex. U (Dkt. 145).
[20] Trustee Ex. C (May 4, 2013 check in amount of $500).
[21] There was no testimony that Lazzo sent the invoice to Garcia or that Garcia received the invoice in the September time frame.
[22] Dkt. 155 and 155-1 (Debtor's Ex. 1).
[23] 11 U.S.C. § 330(a)(4)(B) (2005).
[24] §330(a)(4)(A)(ii).

9

similarly constrained. As long as the time they charge is reasonable, taking into account the six factors that §330(a)(3) requires courts to consider, they may be paid for "representing the interests of the debtor" as opposed to the estate. The fees they are granted under this provision are administrative expenses under §506(b) that are payable under the plan as §1326(b)(1) provides.

Thus, the Trust's claim that Lazzo's work did not "benefit the estate" is beside the point. Lazzo does not represent the estate—he represents the debtor. In chapter 13, the Trustee represents the estate. The Trust generally objects that Lazzo's actions assisted Paul Garcia's allegedly improper post-petition conduct in attempting to secure the restaurant's operation for himself. The Trust did not call out specific time entries to which it took exception.

The Court has an independent duty to scrutinize these entries and determine if they meet the standards of §330(c)(3) and (4)(A).[25] In performing that duty, I observe that only some of Lazzo's time was spent in activities aimed at securing the restaurant's operations. There are entries in May and June that describe dealings with Alex and his chapter 7 trustee to resolve Alex's alleged efforts to undermine the restaurant.[26] Lazzo also worked in May and June to resolve issues with the landlord of La Casita and the Bank of Tescott. Most of the time charged in May, June and July is devoted to this effort. There are 5.6 hours' worth of entries in July that relate to negotiations for the lease of the La Casita location, the purchase of its equipment

---

[25] *In re Cascade Oil Co., Inc.,* 126 B.R. 99, 106 (D. Kan. 1991) (Even in absence of objection to fee application, the bankruptcy court has independent judicial duty to determine whether compensation is reasonable and service necessary); *In re Albrecht,* 245 B.R. 666, 672 (10th Cir. BAP 2000).
[26] Alex's case was converted to chapter 7 on May 29, 2013. *See*, Case No. 12-10394, Dkt. 100.

10

from the secured creditor, and the preparation of pleadings that were never filed. The balance of Lazzo's time appears to have been spent dealing with Trustee requests for information, responding to motions to convert or dismiss, and defending the adversary proceeding.

After carefully reviewing the time records set out on Lazzo's invoice, I conclude that the time spent on the services he describes was reasonable. His requested rate of $200 per hour is, based on my experience reviewing employment and fee applications in this District, quite reasonable given Mr. Lazzo's more than 25 years of experience as a debtor's lawyer and his often-demonstrated skill and experience practicing in this Court. The services appear to have been performed on a timely basis. While there is no evidence in the record either way concerning the "customary compensation of comparably skilled practitioners in cases other than cases under this title," it would be difficult for me to conclude that a comparably skilled attorney with over 25 years of experience practicing civil law in the U.S. District Court for this District, or in the Sedgwick County District Court, would bill less than $200 per hour, particularly in a case that revolves around a messy intra-family dispute.

Turning to the Trustee's specific complaints, the work performed on March 28 and April 1-3 in connection with the Trustee's record subpoenas and motion to compel was necessary. The court record shows that the Trustee issued a subpoena to Paul as resident agent of Lenore's La Casita LLC in Alex's case on December 21, 2012 and moved to compel compliance with that subpoena in January of 2013.[27] Paul was

---

[27] *See* Case No. 12-10394, dkt. 70, 71, and 74.

11

Case 12-10393 Doc# 204 Filed 01/24/14 Page 11 of 19

ordered to comply in response to the Trustee's motion to compel. When he failed to do so, the Trustee moved to dismiss Paul's case on March 19.[28] At the hearing, the Trustee's attorney complained about Lazzo "taking it upon himself" to resolve the issues surrounding the failed response. In fact, his efforts appear to have been in direct response to the Trustee's March 19 motion and were entirely consistent with Lazzo's duty to his client (and to the Court) in this case. His efforts to deal with the motion to dismiss and the issues that prompted it were reasonable and are compensable. That portion of the Trustee's objection to his application must be overruled.

As for the Trustee's complaint that Lazzo should not be compensated for some of his work in connection with the new lease and the equipment purchase, the time expended on these matters appears to be appropriate. The fact the pleadings were not filed after the deal fell through should not prevent Lazzo's being compensated for preparing them. If lawyers only got paid for their successful efforts in this Court, more than a few lawyers would never be paid at all. Success on the merits is only a part of the §330(a)(3) equation. What matters is whether the time spent here was necessary or beneficial at the time the work was done, not in retrospect.[29] This part of the Trustee's objection must also be overruled.

The Trust's objection that Lazzo should be denied compensation because he assisted in the misappropriation of the restaurant should likewise be overruled. Based on the record in this hearing and on my review of the Pretrial Order entered

---

[28] Dkt. 86.
[29] See §330(a)(3)(C).

in the adversary proceeding, Paul and Alex formed an LLC of which they were equal members to acquire and operate Lenore's La Casita. Among the Trust's claims in the adversary proceeding is an assertion that the brothers had a duty to pay for this acquisition shortly after their mother's death and that they defaulted on that duty, among others. Alex and Paul were operating the restaurant while they were in chapter 13 cases. It was their sole means of support and, not coincidentally, of servicing their chapter 13 plans. No LLC operating agreement was placed in evidence, nor was there any evidence that either Paul or Alex was the manager, leaving me to conclude that this entity was "member-managed," meaning each member had the authority to run it and to act as the LLC's agent.[30]

In light of that, Paul's effort to resolve the LLC's eviction and bank loan default by seeking to enter into a new lease and acquire the Bank's collateral via a bankruptcy sale appears, at least based on this sparse record, to have been consistent with his rights and duties as a member. As both he and Alex derived their livelihoods from this operation, preserving it was certainly in their interests. Lazzo represented Paul in this effort and that work appears to have been beneficial and necessary to his client's case. There is simply no showing on this record that Mark Lazzo's actions were improper or inappropriate and he should not be denied compensation on that basis. Under §330(a), his fee application is allowable (but not allowed) in the amount of $10,260.

---

[30] KAN. STAT. ANN. § 17-7693(a) (Absent other provision in operating agreement, management of LLC vested in members in proportion to their percentages of interest; unless otherwise provided in said agreement, each member has authority to bind the company.).

13

2. <u>Lazzo Failed to Comply with Rule 2016(b)</u>.

Compliance with Bankruptcy Rule 2016(b) is more than a pesky technicality: as this case shows, failure to comply goes to the heart of the Court's supervision of the payment of debtors' attorneys that §329 contemplates. Rule 2016(b) requires that within 14 days of receipt of any compensation, the attorney "shall" file a supplemental statement that discloses it and transmit the statement to the United States Trustee.[31] Rule 2016(b) implements §329(a) which requires that a debtor's attorney must file with the court a statement of the compensation the debtor has paid or is to pay, and its source. If an attorney fails to comply with §329(a) and Rule 2016(b), the Court, the creditors, and the U.S. Trustee have no way to know what funds have been paid or where they came from. That effectively strips all three of the ability to evaluate the reasonableness of the attorney's compensation and to demand an accounting for or disgorgement of the unreasonable portions, if any.

Here, Lazzo did not disclose his receipt of any of the $11,000 he received from Paul Garcia or his company until the Trustee filed her motion to dismiss the case on November 18, 2013.[32] Only then did Lazzo file his disclosure which, in turn, prompted the Trustee to file her motion for disgorgement the next day.[33] This motion demanded that he turn over the retainer payments to her pending the Court's determining whether his fee application is reasonable. Lazzo acquiesced to the turnover on the record. As noted above, he defends his failure to disclose stating that he orally

---

[31] Fed. R. Bankr. P. 2016(b).
[32] Dkt. 145.
[33] Dkt. 146.

14

informed Ms. Amyx of his receipt of the payments in the summer of 2013, a statement she controverted in her testimony. Whether he did or didn't tell her about the retainer payments matters only to a small degree—oral statements are not a Rule 2016(b) disclosure.

As Judges Lundin and Brown have stated in their treatise, "The 2016(b) disclosure is not an especially onerous duty in Chapter 13 cases, but it is required of every debtor's attorney."[34] Many courts have denied debtors' attorneys *all* of their compensation as a sanction for failing to disclose. The Trustee doesn't seek that remedy here, but the Trust does.

The Tenth Circuit Bankruptcy Appellate Panel has held that the bankruptcy court has the discretion to deny all compensation for failure to disclose. In *In re Smitty's Truck Stop, Inc.*, a chapter 11 case, the BAP found that debtor's counsel failed to disclose the receipt of his retainer in a Rule 2016(b) statement he filed with the petition.[35] In that case, counsel filed a 2016(b) that stated he had received no funds as compensation other than the filing fee. Eleven days later, he filed a statement of affairs that listed the $5,000 retainer, but never amended his disclosure. When, three years after the case had been converted to chapter 7, the attorney filed an application for compensation, he stated for the first time that he had in fact received the $5,000 and, later, in his amended application, he disclosed the source of the funds. It turned out that the funds were cash collateral, causing the court to

---

[34] Keith M. Lundin & William H. Brown, CHAPTER 13 BANKRUPTCY, 4TH EDITION, §36.3, at ¶ 5, Sec. Rev. Aug. 12, 2009, www.Ch13online.com.
[35] *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.),* 210 B.R. 844, 846 (10th Cir. B.A.P. 1997).

15

conclude that the lawyer had a conflict of interest with the creditor claiming a lien in the funds. The BAP noted that the requirements of §329 and Rule 2016 are mandatory, not permissive, and that an attorney who "fails to comply with the disclosure requirements of § 329 and Rule 2016(b) forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to return fees already received."[36] The attorney's application was denied.

Other courts in the Tenth Circuit have followed suit. In *In re South Station, LLC*, the debtor's attorney filed a Rule 2016(b) statement erroneously representing that no retainer had been paid.[37] In fact, the debtor had paid $20,000 and that prepetition payment was reported on the statement of financial affairs. The attorney explained the error as the result of a "computer glitch," but that error, in concert with other inconsistencies concerning amounts retained in the lawyer's trust account led the court to conclude that the disclosure was incomplete and inadequate. Following *Smitty's Truck Stop* and extensive case law authority from other jurisdictions, it denied the fee application in its entirety.[38]

Both those cases hold that the Court has the discretion to deny all fees as a sanction for failing to comply with Rule 2016(b). In the chapter 13 setting, other courts have exercised their discretion only to partially deny fees. *In re Argento*[39] and *In re Chapman*[40] are two such cases. In *Argento*, the debtor's attorney filed a timely

---

[36] *Id.* at 848, citing *In re Investment Bankers, Inc.*, 4 F.3d 1556, 1565 (10th Cir. 1993).
[37] 464 B.R. 46 (Bankr. D. Utah 2011).
[38] *Id.* at 58-9, citing *Neben & Starrett, Inc. v. Chartwell Financial Corporation (In re Park-Helena Corp.)*, 63 F.3d 877 (9th Cir. 1995).
[39] 282 B.R. 108 (Bankr. D. Mass. 2002).
[40] 323 B.R. 470 (Bankr. W.D. Wis. 2005).

16

2016(b) that disclosed receipt of a $1,500 flat fee for present and future services in the case, but the statement was inconsistent, suggesting that some or all of the money had been paid post-petition. In addition, the debtor's lawyer failed to supplement it as he received more money. Noting that other courts have barred all fees for disclosure errors, that court reduced the attorneys fee by about one-third and warned that strict compliance would be expected in the future.[41] In *Chapman*, the attorney made a disclosure that the court found was intentionally misleading because the attorney had not retained the fees in her trust account as she represented in her statements to the court. As a result, the court admonished her, published its opinion, referred her to the state's disciplinary authorities, and cut the fee by one-half.[42]

There are problems in this case that stem directly from Mr. Lazzo's failure to timely disclose. Garcia has paid him far more in retainer than the fee agreement provides for. The undisclosed additional $9,000 flowed in freely during times when Garcia was in default on his plan payments and his business was failing. Lazzo only disclosed the payments when prompted to do so by the Trustee's motion to dismiss. He offered neither an explanation nor an excuse for his delay other than the alleged telephone conversation with the Trustee's attorney. That, of course, is not a sufficient "disclosure." To Lazzo's credit, he held the funds in his trust account, but did not take them as a fee, pending the approval of this application. He entered the case in the middle and has worked diligently going forward to represent the debtor's interests. And his receipt of the additional funds was not entirely a secret. Alex Garcia knew

---

[41] *Argento*, 282 B.R. 108, 115.
[42] *Chapman*, 323 B.R. 470, 479.

17

Paul attempted to pay at least $2,000 in March of 2013; Alex stopped payment on that check drawn on the Lenore's La Casita account, some eight months before the Trustee filed her motion to disgorge. At least one member of the Garcia family knew Paul was paying attorney fees to Lazzo at that time.[43]

It goes against my grain to cut a lawyer's fees, but in this case, I cannot let a failed fee disclosure go unremarked. As noted above, courts have exercised their discretion to remedy a Rule 2016(b) violation by reducing or withholding an attorney's otherwise allowable fees. Considering that Mr. Lazzo has worked effectively in a difficult matter and that he remains on the hook to defend Paul Garcia's discharge at the trial on the pending adversary proceeding that is set for January 28, 2014, I decline to deny his compensation in its entirety. But he along with the other lawyers who practice in this Court need to be reminded that compliance with the rules that govern attorneys' compensation in bankruptcy is not optional. Here, the failure to disclose led to the trustee's disgorgement motion, a contested fee application, discovery, and a half-day trial—a considerable amount of effort that could have been avoided by the timely filing of a very simple pleading.

Lazzo's fees, otherwise allowable in the amount of $10,260, shall therefore be reduced by one-third, or $3,420, to $6,840. He and any other readers of this Order go warned that future failures to disclose, particularly by lawyers of his experience and ability, will not be treated so lightly.

---

[43] Alex was called by the Trust's lawyer at this hearing as a witness against Lazzo.

18

The Trustee shall distribute $6,840 to Mr. Lazzo as full payment of the fees he requested in the First Motion for Administrative Expenses, and shall hold the balance of the disgorged funds pending the further order of the Court.

###